**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

YVONNE SANCHEZ,

      Plaintiff,

      v.

THE MAX HOTEL, LLC; and
NANCY CLARK,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

While Plaintiff Yvonne Sanchez worked at Defendant The Max Hotel, LLC ("the Max"), the kitchen manager, Mateo Cabello, fondled her, asked her about her virginity, spoke about her "ass," and complained that she was a minor making it impossible to "get with her." After Ms. Sanchez opposed the sexual harassment and her mother complained on her daughter's behalf to Defendant Nancy Clark, the hotel's owner, Ms. Clark called Ms. Sanchez's allegations "unfounded, baseless and damaging," and Defendants immediately fired her, falsely claiming that Ms. Sanchez resigned. As such, the Max is liable to Ms. Sanchez for sexual harassment and retaliation under both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Colorado Anti-Discrimination Act ("CADA"), and Ms. Clark aided and abetted the sexual harassment and retaliation in violation of the state's anti-discrimination laws.

## I.     JURISDICTION AND VENUE

1.     Subject-matter jurisdiction is conferred on this Court is proper pursuant to 28 U.S.C. §§ 1331, 1337, and 1343.

2.     This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Colorado Anti-Discrimination Act, C.R.S. § 24-34-301 *et seq*.

3.     Jurisdiction over Ms. Sanchez's state law claims are proper under 28 U.S.C. § 1367(a) because they are so related to her claims arising under federal law that they form part of the same case or controversy.

4.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).

5.     All unlawful employment practices were committed within the State of Colorado.

6.     At the time of the events giving rise to this litigation and at the time of this filing, all parties resided in Colorado.

## II.     PARTIES

7.     Plaintiff Yvonne Sanchez worked for The Max Hotel LLC as a server at The Max Chophouse at The Max Hotel in Lamar, Colorado between May and November 2022.

8.     Ms. Sanchez is currently over eighteen years old but was a seventeen-year-old minor at the time The Max Hotel LLC employed her.

9.     At all relevant times, Ms. Sanchez was domiciled in the State of Colorado.

10.     Defendant The Max Hotel, LLC is a registered limited liability company whose Articles of Organization were filed with the Colorado Secretary of State in August 2019.

11.     Defendant Nancy Clark owns the Max. Ms. Clark formed the Max as a limited liability company and is its Registered Agent.

12.     Defendant the Max employed Ms. Sanchez within the meaning of Title VII and CADA.

### III.     ADMINISTRATIVE EXHAUSTION

13.     Ms. Sanchez filed Charges of Discrimination against Defendants with the Colorado Civil Rights Division ("CCRD") and dual filed with the Equal Employment Opportunity Commission ("EEOC") on July 19, 2023.

14.     The Charges of Discrimination included allegations of disparate treatment, harassment, and hostile work environment based on sex, retaliation, and aiding and abetting.

15.     The CCRD issued Ms. Sanchez Notices of Right to Sue on June 10, 2024.

16.     Ms. Sanchez has filed this action within 90 days of receiving her Notices of Right to Sue.

### IV.     FACTUAL BACKGROUND

**Yvonne Sanchez's Employment at the Max**

17.     Ms. Sanchez was born and raised in Lamar, Colorado.

18.     In May 2022, when Ms. Sanchez was a senior at Lamar High School, she heard from a friend that the Max was hiring and a good place to work.

19.    Ms. Sanchez had prior experience in the restaurant industry, working in a food truck and a Mexican restaurant, so she applied to the Max.

20.    Ms. Sanchez was hired that same month, and her first day of employment was May 26, 2022.

21.    Like other employees of the Max, Ms. Sanchez received no training on sexual harassment or sexual harassment reporting.

22.    Ms. Sanchez signed an employee handbook in approximately June or July 2022, but no one at the Max reviewed the contents of the handbook or any policies with her at any point in time.

23.    Ms. Sanchez was a well-liked employee who strove to be helpful to her coworkers and customers.

24.    While Ms. Sanchez was employed at the Max, at least four individuals had a "manager" title: Violet Sneyd (restaurant manager), Mateo Cabello (kitchen manager), Michael Payne (general manager), and Tony Gratta (bar manager).

25.    Ms. Sanchez received no written discipline or negative feedback about her performance during her employment at the Max.

26.    Nor did Defendants verbally critique her performance or give her any negative feedback.

27.    Mr. Cabello stated that Ms. Sanchez was "one of my best employees; she would jump in and help," and that he "never had any problems with her."

**Yvonne Sanchez's Subjection to Sexual Harassment at the Max**

28.     At all relevant times, Mr. Cabello was employed as a chef and kitchen manager at the Max.

29.     Between 2007 and 2018, among numerous other charges including assault and domestic violence, Mr. Cabello served sentences for theft, protection order violation, criminal mischief, felony attempt to escape, and harassing communication.

30.     Mr. Cabello began sexually harassing Ms. Sanchez early in her employment at the Max.

31.     Approximately one month after Ms. Sanchez started working, Mr. Cabello told her that he had wondered how old she was since the first day he saw her because he wanted to "hit that."

32.     Mr. Cabello also told Ms. Sanchez that she has "a fat ass."

33.     Mr. Cabello told Ms. Sanchez wished she was not underage so she could "get with him."

34.     In late June or early July 2022, Ms. Sanchez and another teenaged coworker, Diana Castro, were having a conversation in the restaurant about tattoos, and Ms. Sanchez mentioned getting an angel wings tattoo.

35.     Mr. Cabello overheard the conversation and interjected: "You ain't no angel."

36.     He then repeated that both Ms. Sanchez and Ms. Castro "weren't no angels," and asked if they were virgins.

37.     In response, Ms. Sanchez told him the inquiry was inappropriate and asked why he cared.

38.     Similarly, Ms. Castro told Mr. Cabello it was none of his business if they were virgins or not.

39.     Mr. Cabello responded that both Ms. Sanchez and Ms. Castro were lying about being virgins.

40.     Mr. Cabello would frequently play sexual music degrading women and would sing out loud while working at the Max.

41.     Sometimes, Mr. Cabello looked directly at Ms. Sanchez while singing lyrics about big butts, nice bodies, and sexual activity, indicating his intent to subject Ms. Sanchez to the same sexual activity.

42.     Ms. Sanchez found his actions when he did so to be greatly distressing.

43.     In early August 2022, Mr. Cabello again asked Ms. Sanchez if she was a virgin, this time while the two of them were alone.

44.     Ms. Sanchez found Mr. Cabello's repeated inquiries into her virginity threatening and distressing.

45.     When Ms. Sanchez responded that she was a virgin, Mr. Cabello called her a liar.

46.     Around late August or early September 2022, Ms. Sanchez was standing in the kitchen near the coolers when Mr. Cabello walked behind her, grabbed her waist with two hands, and excused his conduct by claiming he was trying to "pass through."

47.     Mr. Cabello did not need to grab Ms. Sanchez's waist to pass by her because there was plenty of space in the kitchen for him to move around freely.

48.     Ms. Castro witnessed Mr. Cabello grab Ms. Sanchez's waist.

49.     Ms. Castro often observed Mr. Cabello get very physically close to other female servers, lasciviously inspect their bodies, and make sexual comments to them.

50.     In early October 2022, Defendant Clark mailed two boxes of black dresses to the restaurant.

51.     Ms. Sanchez went to the back of the restaurant to open them with two of her coworkers, Bailey Cain and Lucinda Carillo.

52.     Mr. Cabello approached the group and said he would like to see all three women wear the dresses.

53.     He specifically told Ms. Cain he wanted to see her "fat ass" in a dress.

54.     Later in the day, Mr. Cabello asked Ms. Sanchez if she was going to wear the dress to work and told her that she should because she had "a nice body" and her "ass" would look good in the dress.

55.     He also told Ms. Sanchez that she would earn more tips if she wore the dress.

56.     In October 2022, when Ms. Sanchez wore the dress to work, Mr. Cabello made sexual remarks about how good she and her "ass" looked in the dress.

57.     When Mr. Cabello made these comments, they made Ms. Sanchez extremely uncomfortable.

58.     In addition to experiencing her own interactions with Mr. Cabello, Ms. Sanchez also observed Mr. Cabello sexually harass her coworkers.

59.     For instance, Ms. Sanchez saw Mr. Cabello grab Ms. Castro's waist multiple times as he was trying to "pass through" the kitchen.

60.     Ms. Sanchez also saw Mr. Cabello go behind Ms. Carillo and grab her waist and move his body suggestively from side to side behind her hips as she was bending down to fill watercrafts with ice from the ice machine on the floor.

61.     Mr. Cabello made sexual remarks to Ms. Cain on a regular basis.

62.     Ms. Cain told Ms. Sanchez she overheard Mr. Cabello tell Mr. Payne that Ms. Cain "wouldn't know what to do if I fucked her because I would fuck her so hard."

63.     Ms. Sanchez also overheard Mr. Cabello make a similar remark about Ms. Sneyd.

64.     The Max employed Ms. Sneyd as a restaurant manager from approximately May through September 2022, more than half the time Ms. Sanchez was employed at the Max.

65.     As frequently as weekly, Ms. Sanchez complained to Ms. Sneyd about Mr. Cabello's language and behavior as described in the above paragraphs.

66.     Ms. Sanchez's complaints to Ms. Sneyd included telling her that Mr. Cabello was "being mean," "cussing," and that the music upset her.

67.     When Ms. Sneyd directly addressed Mr. Cabello's language with him, he would explain it away as being just how he talked and other similar excuses.

68.     Mr. Cabello would shout at Ms. Sneyd if she reaffirmed the inappropriateness of his language.

69.     In addition to verbally reprimanding Mr. Cabello, Ms. Sneyd documented in writing in Mr. Cabello's employee file one incident that occurred around August of 2022.

70.     On that occasion, Ms. Sneyd overheard Mr. Cabello talking to Mr. Payne and saying what he would do sexually to Ms. Sanchez had she been older.

71.     Ms. Sneyd told Mr. Cabello that his verbal conduct was inappropriate.

72.     Ms. Sneyd reported the incident to Defendant Clark.

73.     Ms. Sneyd also documented the incident in writing in Mr. Cabello's employee file.

74.     No further action was taken against Mr. Cabello.

75.     Defendants knew Ms. Sneyd addressed Ms. Sanchez's complaints directly with Mr. Cabello, documented one incident in his employee file, and reported Ms. Sanchez's complaints to Defendant Clark at least weekly.

76.     Mr. Cabello was often mean to Ms. Sneyd, talked down to her, argued with her, and reminded her that she was not his boss.

77.     He called her a "bitch" and "cunt" multiple times, as much as every week, whenever Ms. Sneyd reported his misconduct to Defendant Clark.

78.     In response, Defendant Clark would placate Ms. Sneyd by promising to speak with Ms. Cabello.

79.     Defendant Clark never spoke with Mr. Cabello about his behavior and language.

80.     Even if Defendant Clark did, Mr. Cabello's behavior and language did not improve.

81.     Because they were managers, Messrs. Cabello and Payne controlled the music in the kitchen. They played songs which included lyrics that made frequent use of the "N-word," demeaned women, and positively portrayed sexual assault.

82.     If less offensive music was playing when they arrived on shift, Messrs. Cabello or Payne would change the music when he arrived, stating it was "their kitchen" or that Ms. Sneyd, who frequently tried to play different music, was "not their boss."

83.     When Ms. Sneyd reported to Defendant Clark that she found the music to be inappropriate for a workplace that employed minor girls, Defendant Clark bought Ms. Sneyd noise cancelling headphones but did nothing about Ms. Sneyd's concerns for the environment this created for the minor girls that the Max employed.

### The Max's Retaliation Against Yvonne Sanchez

84.     During her six-month employment at the Max, Ms. Sanchez frequently came home crying after her shift.

85.     When Ms. Sanchez's mother, Yadira Reyes, asked her what was wrong, Ms. Sanchez would mention staff at the Max being rude to her and Mr. Cabello being "super rude."

86.     At first, Ms. Sanchez did not mention the sexual harassment to her mother because she was embarrassed and scared.

87.     On November 13, 2022, Ms. Sanchez again came home in tears after her shift at the Max.

88.    Ms. Sanchez told her mother that Mr. Cabello had cussed her out after she requested a to-go order for a customer.

89.    Ms. Sanchez was very upset and finally confessed to her mother that Mr. Cabello had been sexually harassing her.

90.    Ms. Reyes decided that because Defendant Clark owned the Max, she needed to hear about her daughter's suffering at the Max.

91.    That night, Ms. Reyes texted Defendant Clark.

92.    At first, Ms. Sanchez was warry of her mother mentioning the sexual harassment to Defendant Clark because Ms. Sanchez was embarrassed, afraid of repercussions, had observed Defendant Clark share screenshots of messages with Max employees, and did not believe Defendant Clark was open to suggestions on how to run her restaurant.

93.    Ms. Reyes texted Defendant Clark anyway.

94.    Ms. Reyes apologized for the late-night text and asked Defendant Clark to call her the following morning, so she could "explain the entire situation."

95.    In the text, Ms. Reyes said, "my daughter came home in tears from working at your restaurant" because she was "treated with no dignity and no respect."

96.    Ms. Reyes apologized for getting involved and expressed her displeasure with the treatment of her daughter and responsibility to protect her daughter.

97.    Ms. Reyes said that it would be easy for Plaintiff to quit and find another job, but did not say that Plaintiff intended to quit or was quitting.

98.     To the contrary, Ms. Reyes expressed understanding of the stressful nature of the food industry.

99.     Because of Ms. Sanchez's fears, Ms. Reyes asked Defendant Clark to keep the information in the text confidential.

100.    Defendant Clark did not call Ms. Reyes the following morning, so Ms. Reyes called her.

101.    During the conversation on November 14, 2022, Ms. Reyes apologized again for the late-night text and told Defendant Clark about the previous night's incident.

102.    Ms. Reyes also told Defendant Clark that she believed other inappropriate behavior was occurring at the Max, including some staff members doing drugs in the alley behind the restaurant.

103.    Ms. Reyes then told Defendant Clark about Mr. Cabello sexually harassing Ms. Sanchez at the Max.

104.    Defendant Clark become very upset at the allegation of sexual harassment.

105.    When Ms. Reyes asked her why she was upset, Defendant Clark told her it was because Ms. Reyes was accusing "her best employee of this nonsense" and "we do not accept nonsense accusations."

106.    Defendant Clark defended Mr. Cabello and said that he "could not have done anything."

107.    Defendant Clark then told Ms. Reyes that she did not wish to continue the conversation and told Ms. Reyes to only communicate with her by email.

108.   Defendant Clark told Ms. Reyes to have Ms. Sanchez turn in her uniform to get her last paycheck.

109.   At no point during the conversation on November 14, 2022, did Ms. Reyes tell Defendant Clark that Ms. Sanchez intended to quit.

110.   After their phone conversation, Ms. Reyes sent a text message to Defendant Clark confirming Ms. Sanchez's wishes to continue employment if Defendant Clark created a plan to address the sexual harassment.

111.   Instead of creating a plan, however, Defendant Clark responded with overt hostility.

112.   Defendant Clark sent Ms. Reyes an angry and demeaning email less than one hour later.

113.   A full and true copy of that email is attached as Exhibit 1.

114.   In line with Ms. Sanchez's fears, Defendant Clark carbon copied Mr. Cabello, among other employees on her email response.

115.   In her email response, Defendant Clark spewed hostile and derogatory retorts at Ms. Reyes.

116.   Defendant Clark made a point to immediately express her scorn at the sexual harassment complaint via her use of red font color and uppercase font, repeatedly saying the allegation caused "damage," questioning Ms. Reyes' understanding of "what sexual harassment is," and critiquing a typo as "your use of verbiage, not mine."

117.   Defendant Clark then twisted Ms. Reyes' text messages and conversations into resigning on behalf of Ms. Sanchez.

118.    Defendant Clark acknowledged that Ms. Reyes reported sexual harassment but claimed Ms. Reyes did not provide "any details, information, facts to substantiate a claim of sexual harassment."

119.    Defendant Clark claimed to take the allegation seriously but immediately following called the allegation an attempt to "damage our business, our reputation or our continued operations."

120.    Defendant Clark did nothing to investigate or correct the harassment.

121.    The only incident Defendant Clark claimed to have investigated was an incident of bullying and cursing, not of sexual harassment.

122.    Ms. Sanchez also never alleged she was sexually harassed or assaulted the night of November 13, 2022.

123.    Defendant Clark insisted on ending Ms. Sanchez's employment immediately instead of investigating or responding to the harassment complaint.

124.    Defendants did not complete a neutral, contemporaneous investigation into the sexual harassment complaints as the law generally requires.

125.    Upon receiving the complaint, Defendants dismissed Ms. Sanchez's sexual harassment allegations out of hand through character assassination on wholly unrelated grounds.

126.    Defendant Clark accused Ms. Sanchez of harassment and suggested that making a complaint was tantamount to resigning.

127.    Defendants did not even speak to Ms. Sanchez to learn her version of events or ask other female employees if they were sexually harassed.

128.    Instead, Defendant Clark told Ms. Reyes that Defendants "will not reopen that door to continued unfounded claims" and again instructed Ms. Reyes to have Ms. Sanchez turn in her uniforms in exchange for receiving her final paycheck.

129.    Later that night, on November 14, 2023, Ms. Reyes responded to Defendant Clark's email.

130.    Ms. Reyes reiterated that "[t]he purpose of the conversation with [Defendant Clark] this morning was to report the ongoing sexual harassment that my minor daughter has been experiencing for months by Mateo" and "[t]he expectation was for you to conduct an investigation and include us in it."

131.    Ms. Reyes again stated that "I never said that my daughter was quitting" and described how Defendant Clark refused to listen her concerns about Mr. Cabello's behavior during their morning conversation and instead said that he was "[her] best employee" and "could not have done anything."

132.    Ms. Reyes asked Defendant Clark to tell her who Defendants interviewed during the investigation and provide a reason for Ms. Sanchez's termination.

133.    Ms. Reyes never heard back from Defendant Clark.

134.    On November 16, 2022, Ms. Reyes dropped off Ms. Sanchez's uniforms per Defendant Clark's request and asked Defendant Clark to mail Ms. Sanchez's paycheck to her home address.

135.    Ms. Sanchez did not receive her final paycheck until about one month after her uniforms were returned.

## V.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 2000e-2(a)(1)**
**Sex-Based Hostile Work Environment under Title VII**
**(Against Defendant The Max Hotel)**

136.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

137.    Defendant The Max Hotel discriminated against Ms. Sanchez in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by subjecting her to sexual harassment and by creating and tolerating a sexually hostile work environment.

138.    The offensive sexual conduct described in the preceding paragraphs was and is sufficiently severe or pervasive to have altered the terms and conditions of Ms. Sanchez's employment.

139.    The sexual harassment and hostile work environment to which Ms. Sanchez was subjected was perpetuated by Defendant's management employees with supervisory authority over Ms. Sanchez and occurred on a frequent and routine basis over a substantial period.

140.    The sexual harassment was subjectively unwelcome.

141.    The sexual harassment was objectively offensive.

142.    Defendant knew or should have known of the sexually hostile work environment because the highest serving managers in the restaurant engaged in the harassing conduct, and other managers, supervisors, and employees observed it. Moreover, the harassment was frequent and notorious in nature, and Ms. Sanchez complained about it.

143.    Defendant Max Hotel failed to take appropriate, prompt, or effective action to prevent, correct, or remedy the sexually hostile work environment.

144.    The effect of the practices complained about above has been to deprive Ms. Sanchez of equal employment opportunities and otherwise adversely affected her status as an employee because of her sex.

145.    Defendant intentionally committed the unlawful employment practices complained of above.

146.    Defendant committed the unlawful employment practices complained of above with malice or reckless indifference to Ms. Sanchez's federally protected rights.

147.    As a result of the events and actions described above, Ms. Sanchez experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, and was otherwise adversely affected.

148.    The sexual harassment against Ms. Sanchez was coupled with a tangible employment action.

## SECOND CLAIM FOR RELIEF
### C.R.S. §§ 24-34-402(1)(a)(I)
### Sex-Based Hostile Work Environment under CADA
### (Against Defendant The Max Hotel)

149.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

150.    Defendant The Max Hotel engaged in discriminatory and unfair employment practices in the State of Colorado in violation of C.R.S. § 24-34-402(1)(a)(I) by subjecting

Ms. Sanchez to sexual harassment and by creating and tolerating a sexually hostile work environment.

151.    During the course of Ms. Sanchez's employment, Defendant's employee harassed Ms. Sanchez within the meaning established under C.R.S. § 24-34-402(1.3) because of her sex.

152.    The physical and verbal conduct directed at Ms. Sanchez because of her sex was unwelcome and subjectively offensive.

153.    The physical and verbal conduct directed at Ms. Sanchez because of her sex was objectively offensive.

154.    The sexual harassment and hostile work environment to which Ms. Sanchez was subjected was perpetuated by Defendant's management employees with supervisory authority over Ms. Sanchez and occurred on Defendant's premises on a frequent and routine basis over a substantial period of time.

155.    The conduct and communication was humiliating and degrading.

156.    Ms. Sanchez's submission to the conduct and communication was implicitly made a term or condition of her employment.

157.    Ms. Sanchez's submission to, objection to, or rejection of the conduct and communication was used as a basis for Defendant's employment decisions affecting her.

158.    The conduct and communication unreasonably interfered with Ms. Sanchez's work performance and created an intimidating, hostile, or offensive working environment.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 2000e-3(a)**
**Retaliation under Title VII**
**(Against Defendant The Max Hotel)**

159.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

160.    Defendant The Max Hotel engaged in unlawful employment practices in the State of Colorado in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), by retaliating against Ms. Sanchez.

161.    Ms. Sanchez opposed what she reasonably believed was unlawful discriminatory practices based on sex, which is a protected activity under Section 704 of Title VII.

162.    Ms. Sanchez opposed sexual harassment and a sexually hostile work environment by repeatedly reporting it to her supervisor who repeatedly reported it to Defendant.

163.    Finally, Ms. Sanchez opposed the harassment and hostile work environment through her mother who reported it to Defendant.

164.    In retaliation for engaging in protected activity, Defendant discharged Ms. Sanchez.

165.    In the unlikely event the Court determines that Ms. Sanchez's mother resigned on her behalf, and in the alternative, Defendant constructively discharged Plaintiff.

166.    Defendant directly and vicariously caused Ms. Sanchez's harm.

167.    Defendant intentionally committed the unlawful employment practices complained of in the foregoing paragraphs.

168.    Defendant committed the unlawful employment practices complained of above with malice or with reckless indifference to Ms. Sanchez's federally protected rights.

169.    As a result of the events and actions described above, Defendant's unlawful retaliation deprived Ms. Sanchez of equal employment opportunities and adversely affected her status as an employee.

170.    Ms. Sanchez also experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and was/is otherwise adversely affected because of Defendant's unlawful retaliation.

**FOURTH CLAIM FOR RELIEF**
**C.R.S. §§ 24-34-402(1)(e)(IV)**
**Retaliation under CADA**
**(Against Defendant The Max Hotel)**

171.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

172.    Defendant The Max Hotel engaged in discriminatory and unfair employment practices in the State of Colorado in violation of C.R.S. § 24-34-402(1)(e)(IV) by discharging Ms. Sanchez for engaging in protected activity.

173.    Ms. Sanchez engaged in protected activity under C.R.S. § 24-34-402(1)(e)(IV) by opposing sexual harassment and a sexually hostile work environment.

174.    Ms. Sanchez opposed the harassment and hostile work environment by repeatedly reporting it to her supervisor, who repeatedly reported it to Defendant.

175.    Defendant took no reasonable action in response to the repeated reports.

176.    Finally, Ms. Sanchez opposed the harassment and hostile work environment through her mother who reported it to Defendant.

177.    In response to this final opposition, Defendant discharged Ms. Sanchez.

178.    Defendant did not establish a program reasonably designed to prevent harassment, deter future harassers, and protect employees from harassment.

**FIFTH CLAIM FOR RELIEF**
**C.R.S. § 24-34-402(1)(e)(I)**
**Aiding and Abetting a Sexually Hostile Work Environment and Retaliation under CADA**
**(Against Defendant Clark)**

179.    The allegations in the foregoing paragraphs are hereby incorporated by reference.

180.    Defendant Clark engaged in discriminatory and unfair employment practices in the State of Colorado in violation of C.R.S. § 24-34-402(1)(e)(I) by aiding and abetting discriminatory or unfair employment practices.

181.    Defendant Clark acted with knowledge of Mr. Cabello's unlawful sexual harassment of Ms. Sanchez.

182.    Defendant Clark facilitated Mr. Cabello's unlawful sexual harassment of Ms. Sanchez.

183.    Defendant Clark aided Mr. Cabello's unlawful sexual harassment of Ms. Sanchez.

184.    Defendant Clark facilitated the sexually hostile work environment at the Max.

185.    Defendant Clark aided the sexually hostile work environment at the Max.

186.    Defendant Clark also retaliated against Ms. Sanchez, terminating her after Ms. Sanchez opposed the harassment and complained through her mother about the harassment. In doing so, Defendant Clark aided and abetted the Max in perpetuating unlawful employment practices.

187.    Defendant Clark intentionally committed the unlawful employment practices complained of in the foregoing paragraphs.

188.    Defendant Clark's actions deprived Ms. Sanchez of equal employment opportunities, adversely affected her status as an employee, caused Ms. Sanchez damages and emotional suffering, and were done with malice or reckless indifference to Ms. Sanchez's rights.

189.    Ms. Sanchez also experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and was/is otherwise adversely affected because of Defendant Clark's unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, pursuant to Title VII and CADA, requests the Court enter judgment for the following relief:

a.  All declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Front pay in lieu of reinstatement;

f.  Pre-judgment and post-interest at the highest lawful rate;

g.  The maximum tax-offset permitted by law;

h.  Attorney's fees and costs; and

i.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: September 6, 2024

Rathod | Mohamedbhai LLC

*/s/ Iris Halpern*
Iris Halpern
2701 Lawrence St.
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
ih@rmlawyers.com

ATTORNEY FOR PLAINTIFF

# Exhibit 1

Response to allegations made today's date

| | |
|---|---|
| From: | Nancy Clark (nancy@unleaded.digital) |
| To: | yadirareyes82@yahoo.com; yvonnesanchez3@outlook.com |
| Cc: | jarod@unleaded.digital; joseph@unleaded.digital; hbluml75@gmail.com; michael@themaxhotel.com; mateo@themaxhotel.com; tony@themaxhotel.com |
| Date: | Monday, November 14, 2022 at 05:11 PM MST |

Yadira Reyes:

I am in receipt of your texts to me received last night at 10:27pm and I received your phone call this morning at 9:20 am (time zone I am presently working in) 8:20 am Colorado time. All are copied above. In your call this morning you criticized that I had not yet called you back given your text 10 hours earlier. NIGHTTIME HOURS I MIGHT ADD.

**I understand from your text and your statements this morning on the phone that you do not want your daughter, Yvonne, to work at the Max. As you are her custodian and mother, we accept her resignation vis-à-vis your communication to me today's date.**

You allege sexual harassment transpired. You claimed on the phone call that you are going to file for sexual harassment. You have not supplied any details, information, facts to substantiate a claim of sexual harassment.

We take this claim very, very seriously. We take unsubstantiated claims as seriously… particularly when it is intended to damage our business, our reputation or our continued operations.

Some facts you should know about what went down at the Max Sunday involving your daughter. To wit, our hours at the Max on Sunday are 4pm – 8pm. Guests arrived and were seated at approximately 7:30pm. Yvonne was assigned as waitstaff to this table. She took the order. The customers asked that they be able to take a to-go order with them (YOU INSIST THESE CUSTOMERS IN QUESTION WERE RESIDING AT THE MAX AND THAT IS WHOLLY UNTRUE). Yvonne served their meal and only later when the customers reminded

Yvonne of their wish for a to-go order did Yvonne remember that she never turned in the order.

It was 8:27pm, 27 minutes AFTER the kitchen closed. 27 minutes AFTER our Kitchen Manager took the time to personally remind Yvonne and other waitstaff that the kitchen would be closing at 8pm. Our kitchen staff was wrapping up final details of cleaning as required by the health department by 8:27pm.

***The failure was Yvonne did not turn in the order.*** The damage done by her forgetting is minimal when contrasted by your allegations of sexual harassment.

Today, I surveyed the team, managers and staff members, for detailed reports on the situation you claim transpired involving sexual harassment. I reviewed video tape. I revised a Max policy, specifically that we will never again hire any person under the age of 18. I spent the better part of today having voluminous and extensive conversations with my people, and wouldn't you know it, all of my people, across the board, reported no such incident of sexual harassment occurred to your daughter. My video footage review of the night reaffirms that. This consumed many, many hours of my day.

Also of concern, you claimed today that my managers and team "do drugs in the alley and that I [sic] can prove it." You claim to have videos. I requested that proof from you. I have not yet received such from you and I look forward to your sending that evidence for review by my legal team.

Your final text of today states that your daughter is willing to continue to work for the Max IF I WILL CREATE A PLAN TO DEAL WITH THE SEXUAL HARASSMENT.

You terminated Yvonne's employment at the Max. We will not reopen that door to continued unfounded claims. That in fact IS harassment. And that brings me to my

overarching question: Do you even know what sexual harassment is? Declining to turn on a grill after the kitchen is closed down is NOT sexual harassment. It's not even plain old harassment. It is POLICY. IT IS NOT harassment to recommend the wait staff advise the unserved to go to McDonald's or another food outlet. THAT IS NOT HARASSMENT. That is common sense.

Additionally, you made claims that your daughter is "scare" (your use of verbiage, not mine) "of this person." You simply cannot make allegations like this that are meritless AND NAMELESS. You refuse to name the person. That's unfounded, baseless and damaging.

Just so you know, we, like any informed and law-abiding business have an employee manual. We practice policy adherence, not crazy wild claims of injustice. Yvonne was given a copy. She signed a statement that she received a copy upon hiring.

When an employee terminates employment, such as you have done on behalf of your daughter Yvonne, final payment is made at the next routine pay period. I will notify Yvonne of the date she can retrieve her final paycheck next week. Max uniforms in her possession shall be returned to our offices in that exchange.

Nancy Clark
Partner
Unleaded.Digital
303-399-8635
nancy@unleadedgroup.com

cc: Legal

Screenshot 2022-11-14 at 4.30.06 PM (002).png

346.9kB

 Screenshot 2022-11-14 at 4.30.31 PM.png
352.2kB

 Screenshot 2022-11-14 at 4.30.48 PM.png
110.6kB